## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

EDWARD CABLE, CAROLE
DANGELO, SOPHIA MARKS,
ALBERT SHEARER, AND REBECCA
YOUNK, individually and on behalf of
all others similarly situated,

        Plaintiffs,

v.

MORLEY COMPANIES, INC.,

        Defendant.

CASE NO. _____

**NOTICE OF REMOVAL**

**CLASS ACTION**

Pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446, and 1453, Defendant Morley

Companies, Inc. ("Defendant" or "Morley") hereby removes this action filed by

Edward Cable, Carole Dangelo, Sophia Marks, Albert Shearer, and Rebecca Younk

("Plaintiffs"), individually and behalf of all others similarly situated, from the Tenth

Judicial Circuit Court, State of Michigan, Case No. 22-046585-CZ-5, to the United

States District Court for the Eastern District of Michigan.

## **JURISDICTION**

1.     This is a civil action over which the Court has original subject matter

jurisdiction under 28 U.S.C. § 1332. Removal is proper under the Class Action

Fairness Act of 2005 ("CAFA"), codified in pertinent part at 28 U.S.C. § 1332(d).

2.      This Court is in the judicial district and division embracing the place where the state court case was brought and is pending.  Thus, this Court is the proper district court to which this case should be removed.  28 U.S.C. §§ 1441(a), 1446(a).

## BACKGROUND AND TIMELINESS OF REMOVAL

3.      On February 17, 2022, Plaintiffs, on behalf of themselves and, purportedly, others similarly situated, filed a Class Action Complaint (the "Complaint") against Morley in the Tenth Judicial Circuit Court, State of Michigan, Case No. 22-046585-CZ-5 (the "State Court Action").   Plaintiffs filed the Complaint as a putative class action.

4.      On March 2, 2022, Plaintiffs served Morley with copies of the Summons and Complaint via process server.  Pursuant to 28 U.S.C. § 1446(a), all process, pleadings, and orders that have been filed and served in the State Court Action are attached to this Notice as **Exhibit A**.

5.      This removal is timely because Morley filed this removal within 30 days of being served with the Complaint.  *See* 28 U.S.C. § 1446(b) (notice of removal shall be filed within 30 days of service of complaint); *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 56 U.S. 344, 348 (1999) (time period for removal begins when defendant is served).

## CAFA JURISDICTION

6.      <u>Basis of Original Jurisdiction.</u>  This Court has original jurisdiction over this action under CAFA (codified in pertinent part at 28 U.S.C. § 1332(d)). Section 1332(d) provides that a district court shall have original jurisdiction over a class action with one hundred (100) or more putative class members in which the matter in controversy, in the aggregate, exceeds the sum or value of $5,000,000, and any member of the putative class is citizen of a different state than that of the defendant.  § 1332(d)(1)-(2)(A); *Nessel ex rel. Mich. v. AmeriGas Partners, L.P.*, 954 F.3d 831, 834 (6th Cir. 2020); *Bhasin v. United Shore Fin. Servs., LLC*, Case No. 20-13278, 2022 WL 662284, at *3 (E.D. Mich. Mar. 4, 2022) (citing *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84-85 (2014)).

7.      As set forth below, pursuant to 28 U.S.C. § 1332(d) and § 1441(a), Morley may remove the State Court Action to federal court under CAFA because: (1) this action is pled as a class action; (2) the putative class includes more than one hundred (100) members; (3) "minimal diversity" exists, *i.e.*, members of the putative class are citizens of a state different from that of Defendant; and (4) the matter in controversy, in the aggregate, exceeds the sum or value of $5,000,000, exclusive of interest and costs.  *See Clark v. Lender Processing Servs.*, 562 F. App'x 460, 465 (6th Cir. 2014).

## THIS ACTION IS PLED AS A CLASS ACTION

8.      CAFA defines a "class action" as "'any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action.'" *AmeriGas Partners. L:P.*, 954 F.3d at 834 (quoting 28 U.S.C. § 1332(d)(1)(B)).

9.      Plaintiffs bring this action as a "class action" and seek class certification under Michigan law pursuant to Michigan Court Rule 3.501.  [Compl., ¶ 62.]  Because Michigan Court Rule 3.501 is a "similar State statute authorizing an action to be brought by 1 or more representatives as a class action," the first CAFA element is satisfied.  *See Nessel ex rel. Mich. v. Amerigas Partners, L.P.*, 421 F. Supp. 3d 507, 511 (E.D. Mich. 2019) ("There is of course a Michigan analog to Federal Rule of Civil Procedure 23, Michigan Court Rule ('MCR') 3.501, which mirrors the adequacy, numerosity, typicality, and commonality requirements of the federal rule."); *Coulter-Owens v. Time, Inc.*, CASE NO. 12-CV-14390, 2016 WL 612690, at *6 (E.D. Mich. Feb. 16, 2016) (affirming district court's subject matter jurisdiction in class action brought in state court under Michigan Rule of Court 3.501 and removed to federal court pursuant to CAFA).

## THE PUTATIVE CLASS INCLUDES AT LEAST ONE HUNDRED (100) MEMBERS

10.     Plaintiffs allege that "starting in August 2021, [Morley] determined that a ransomware attack on its data systems prevented access to certain files [which contained Plaintiffs' and putative class members allegedly personal information] within the company's database." [Compl., ¶ 4.]  Plaintiffs further allege that, as a result, Plaintiffs' and putative class members' "sensitive personal information [was] . . . accessed by unauthorized third parties" (the "Ransomware Attack"). [*Id.* at ¶ 3.]

11.     Plaintiffs purport to bring this action on behalf of themselves and a "Nationwide Class," defined as "[a]ll persons whose PII was maintained by [Morley] and that was compromised as result of the [Ransomware Attack] publicly disclosed in or about August 2021[.]" [*Id.* at ¶ 62.]  In addition to and/or in the alternative, Plaintiffs assert claims on behalf of themselves and a "Subclass," defined as "[a]ll residents of Michigan whose PII was maintained by [Morley] and that was compromised as a result of the [Ransomware Attack] publicly disclosed in or about August 2021[.]" [*Id.* at ¶ 63.]

12.     Plaintiffs alleges that "the sensitive personal information of at least 500,000 individuals," including Plaintiffs', was "accessed by unauthored third parties" during the Ransomware Attack. [*Id.* at ¶ 3.]

– 5 –

13.     Based on the above, the number of putative class members exceeds the statutorily-required minimum of 100 individuals.

## "MINIMAL DIVERISTY" OF CITIZENSHIP EXISTS

14.     Pursuant to 28 U.S.C. § 1332(d)(2)(A), "the district court shall have original jurisdiction" over a "class in which . . . *any member of the class of plaintiffs is a citizen of a State different from any defendant*."  (emphasis added).  *See also Buloan v. Gen. Motors, LLC*, Case No. 19-13220, 2020 WL 3867277, at \*7 (E.D. Mich. July 9, 2020) (diversity of citizenship necessary to satisfy CAFA pursuant to § 1332(d)(2) exists when "minimal diversity" is satisfied, *i.e.*, when "any member of a class of plaintiffs is a citizen of a State different from any defendant").

15.     <u>Morley's Citizenship</u>.  Pursuant to 28 U.S.C. § 1332(c), a corporation is a citizen both of the state in which it has its principal place of business and the state in which it is incorporated.  *See Beanstalk Innovation, Inc. v. SRG Tech., LLC*, 823 F. App'x 404, 408 (6th Cir. 2020) ("A corporation is a citizen of both the state in which it is incorporated and the state in which the corporation's principal place of business is located.").  "A corporation's 'principal place of business,' is its 'nerve center,' i.e., 'the place where a corporation's officers direct, control, and coordinate the corporation's activities.'"  *Estate of Rode v. Citizens Ins. Co. of Midwest*, Case No. 17-10615, 2017 WL 9325285, at \*2 (E.D. Mich. Sept. 28, 2017) (quoting *Hertz Corp v. Friend*, 559 U.S. 77, 93 (2010)).  In practice, the "nerve center" is normally

– 6 –

the location of the corporation's headquarters.  *Id.*  Morley Companies, Inc. is incorporated under the laws of the State of Michigan and with headquarters at 2811 Schust Road, Saginaw, Michigan 48603.  Because Morley is incorporated in Michigan and maintains its principal place of business in Michigan, Morley is a citizen of Michigan..

16.   <u>Plaintiffs' and the Putative Class Members' Citizenship</u>.  For diversity purposes, an individual is a "citizen" in the state in which he or she is domiciled.  *Smith v. Smith*, 526 F. Supp. 3d 263, 266 (E.D. Mich. 2021) (citing *Napletana v. Hillsdale Coll.*. 384 F.2d 871, 872 (6th Cir. 1967)); 28 U.S.C. § 1332(a)(1).  "Domicile" generally refers to a person's "'true, fixed, and permanent home and principal establishment.'"  *Smith*, 384 F.2d at 266 (quoting *Eastman v. Univ. of Mich.*, 30 F.3d 670, 672-73 (6th Cir. 1994)).  "[T]he law affords a rebuttable presumption a person's residence is his domicile" *Mason v. Lockwood, Andrews, & Newman, P.C.*, 842 F.3d 383, 390 (6th Cir. 2016) (recognizing the "primacy of residency in the domicile calculus," and stating that "a person's being at a place is *prima facie* evidence that he is domiciled at that place" (citations and internal punctuation marks omitted)).  As alleged in the Complaint, Plaintiffs all reside in, and are citizens of, Michigan.  [Compl., ¶¶ 19-23.]  In fact, there are 4 out-of-state plaintiffs that are suing Morley for similar allegations involving the same Ransomware Attack in District Court for the Eastern District of Michigan.  *See,*

– 7 –

*e.g.*, *Thomsen, et al. v. Morley Cos., Inc.*, Case No. 1:22-cv-10271-TLL-PTM, Amended Class Action Compl. (ECF #7) (E.D. Mich.) (Ludington, J.) (plaintiffs allege to be residents of Tennessee, Arizona, and Michigan).[1]

17.     Plaintiffs, however, seek to represent a nationwide class (1) that includes "[a]ll persons whose PII was maintained by [Morley] and that was compromised as result of the [Ransomware Attack] publicly disclosed in or about August 2021" and (2) that is not geographically limited.  [*See id.* at ¶ 62.]  To date, Morley has sent notifications to individuals with addresses in all fifty states as well as Puerto Rico and the District of Columbia.

18.     Therefore, the class, as defined by Plaintiffs, includes individuals who are citizens of a state other than the State of Michigan, the state of citizenship for Morley.  And because at least one of the putative class members is a citizen of a state other than Michigan, "minimal diversity" is established pursuant to CAFA.  *See Buloan*, 2020 WL 3867277, at *7.

---

[1] Morley notes that a third, related action was filed against Morley in the Eastern District of Michigan on February 18, 2022, titled *Ratcliff v. Morley Cos., Inc.*, Case No. 1:22-cv-10360-TLL-PTM.  That action is still pending and is also assigned to the Honorable Thomas L. Ludington.

## THE AMOUNT IN CONTROVERSY EXCEEDS THE CAFA THRESHOLD[2]

19.     Where a complaint does not specify the amount of damages sought, as is the case with Plaintiffs' Complaint, the removing defendant must prove by a preponderance of the evidence that the jurisdictional amount-in-controversy is satisfied.  28 U.S.C. § 1446(c)(2)(B).  The United States Supreme Court has held that "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold" to meet the amount-in-controversy requirement.  *Dart Cherokee Basin Operating Co., LLC*, 574 U.S. at 90.  The party opposing jurisdiction must show "to a legal certainty" that the amount recoverable does not meet the jurisdictional threshold, and most courts to consider the issue "have found a legal certainty that more than the jurisdictional amount could not be recovered only where the applicable state law barred the *type of damages* sought by the plaintiff." *Kovacs v. Chesley*, 406 F.3d 393, 396 (6th Cir. 2005) (citation omitted).  Furthermore, in determining the amount in controversy under CAFA, "[t]he claims of all plaintiffs are aggregated to determine if the amount in controversy is more than $5 million," *Buloan*, 2020 WL 3867277, at *6

---

[2] The amounts set forth in this Notice of Removal are solely for purposes of establishing that the amount in controversy exceeds the $5,000,000 threshold and are not intended and cannot be construed as an admission that Plaintiffs or putative class members can state or have stated a claim or that they are entitled to damages in any amount.  Morley denies liability, denies Plaintiffs and/or class members are entitled to recover any amount, and denies that a class can be properly certified in this matter.

(citation omitted), including "'class members' . . . (named or unnamed) who fall within the definition of the *proposed* or certified class,'" *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citation omitted) (emphasis in original).

20.    As demonstrated below, the allegations in the Complaint make it more likely than not that the amount in controversy under CAFA exceeds $5,000,000.

21.    <u>Claims for Negligence and Negligence *Per Se*</u>.  Plaintiffs bring claims for negligence and negligence *per se*. [Compl., ¶¶ 70-86 (negligence); ¶¶ 87-94 (negligence *per se*).]

22.    Plaintiffs allege that Morley had a "duty to use reasonable means to secure and safeguard [Plaintiffs' and class members'] PII it collected, generated, and stored to prevent disclosure of the information," and had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act ("FTC"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d *et. seq.* [*Id.* at ¶¶ 3, 73, 75-78, 89-90.]

23.    Plaintiffs also allege that Morley "breached its duties to use reasonable measures to protect patients' PII," by, *inter alia*, "failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class members' PII" and "failing to recognize in a timely manner that Class Members' PII had been compromised." [*Id.* at ¶¶ 80, 83.]

24.     Plaintiffs further allege that Morley failed to comply with applicable laws, including HIPAA and Section 5 of the FTC, "by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiffs' and Class members' PII," and that such failure constitutes negligence *per se*.  [*Id.* at ¶¶ 88-91.]

25.     As a result, Plaintiffs claim they and the Class have suffered and will continue to suffer, among other things, "ongoing, imminent, impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm"; "actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm"; "loss of the confidentiality of the stolen data"; "the illegal sale of the compromised data on the black market (dark web)"; "expenses and/or time spent on credit monitoring and identity theft insurance"; and "time spent scrutinizing bank statements, credit card statements, and credit reports" and "expenses and/or time spent initiating fraud alerts."  [*Id.* at ¶ 85.]  Plaintiffs therefore "seek an order declaring that [Morley]'s conduct constitutes negligence and awarding damages in an amount to be awarded a trial."  [*Id.* at ¶ 86.]  Plaintiffs also allege that they "have suffered injury and are entitled to damages in an amount to be proven a trial" due to Morley's negligence *per se*.  [*Id.* at ¶ 94.]

26.     The Complaint contains no allegations that would support or suggest the amount in damages Plaintiffs or any of the putative class members allegedly

sustained as a consequence of Morley's negligence or negligence *per se*.  However, because Plaintiffs seek recovery for "ongoing, imminent, impending threat of identity theft crimes, fraud, and abuse," "actual identity theft crimes, fraud, and abuse," "the illegal sale of the compromised data on the black market (dark web)," time spent scrutinizing bank statements, credit card statements, and credit reports," "expenses and/or time spent initiating fraud alerts," and "expenses and/or time spent on credit monitoring and identity theft insurance," one option for assigning a value to these damages is through the cost of credit monitoring.

27.    Three  main  identity-protection  agencies—Equifax,  IDShield,  and Experian—advertise monthly rates for credit-monitoring services ranging from $14.95 to $19.99 per person per month.  For example, IDShield Individual offers one-bureau  credit  monitoring  with  an  unlimited  service  guarantee,  dark  web internet monitoring, data breach notifications, full-service restoration when theft occurs, and 24/7 emergency assistance, among other services, for $14.95 per month

for one individual.[3]   Similarly, both Equifax[4] and Experian[5] offer products that provide 3-Bureau credit monitoring with up to $1 million in identity theft insurance for $19.95 and $19.99 a month, respectively.  Multiplying the cost of providing one month of credit-monitoring services at $14.95 (the cheapest of the three products) by the number of alleged putative class members, the amount in controversy for just credit monitoring is approximately $7,475,000 (calculated as approximately 500,000 individuals notified, times 1 month, times $14.95 per month).  Combining Plaintiffs' and the putative class members' alleged other negligence and negligence *per se* damages with their potential credit-monitoring damages adds even more to the total amount in controversy in excess of $5,000,000.

---

[3] *See IDShield Plans & Pricing*, https://www.idshield.com/plans-and-pricing (last visited Mar. 27, 2022); *see also IDShield Individual*, https://checkout.idshield.com/?plan=IDSI&freetrial=true&region=TX (last visited Mar. 27, 2022).

[4] *See Equifax*, https://www.equifax.com/equifax-complete/Equifax/?CID=2_equifax%20credit%20monitoring_G_e&adID=502355994880&DS3_KIDS=p50281164756&campaignid=71700000061086345&sakwid=43700050281164756&gclid=EAIaIQobChMIzpzAneG28wIVS9KzCh3vCA_MEAAYASAAEgIjevD_BwE&gclsrc=aw.ds (last visited Mar. 27, 2022).

[5] *See Experian CreditLock*, https://www.experian.com/lp/creditlock.html?bcd=ad_c_sem_427_515842009606&k_id=_k_EAIaIQobChMIzZ63geO28wIVTR-tBh0rgAUsEAAYASABEgIWwfD_BwE_k_&k_kw=aud-422897489015:kwd-317312162328&k_mt=e&pc=sem_exp_google&cc=sem_exp_google_ad_858684474_43905679139_515842009606_aud-422897489015:kwd-317312162328_e___k_EAIaIQobChMIzZ63geO28wIVTR-tBh0rgAUsEAAYASABEgIWwfD_BwE_k_&ref=identity&awsearchcpc=1&gclid=EAIaIQobChMIzZ63geO28wIVTR-tBh0rgAUsEAAYASABEgIWwfD_BwE (last visited Mar. 27, 2022).

28.     <u>Claim for Negligent Misrepresentation</u>.  Plaintiffs also bring a claim for negligent misrepresentation. [Compl., ¶¶ 95-101.]

29.     Specifically, Plaintiffs allege that Morley had a "duty and occupied a special relationship with Plaintiffs and Class members, as [Morley]'s patients," and that Morley "negligently prepared information and misrepresented materials facts, pertaining to the provision of health care services, to Plaintiffs and Class members by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiffs' and Class members' PII from unauthorized disclosure, release, data breaches, and theft."  [*Id.* at ¶¶ 96-97.]

30.     Consequently, "[i]n reasonable justifiable reliance upon these misrepresentations," Plaintiffs allege that they and putative class members "purchased healthcare services from [Morley]," but, "[h]ad [they], as reasonable persons, known of [Morley]'s inadequate data privacy and security practices, . . . they would not have purchased [said] healthcare services benefits from [Morley], and would not have entrusted their PII to [Morley]."  [*Id.* at ¶¶ 99-100.]  As a result, Plaintiffs claim they and putative class members have been injured.  [*Id.* at ¶ 101.]

31.     The Complaint contains no allegations that would support or suggest the amount in damages Plaintiffs or any of the putative class members allegedly sustained as a consequence of Morley's negligent misrepresentation.  Nevertheless, combining Plaintiffs' and the putative class members' alleged negligent

misrepresentation damages with their other damages' claims adds even more to the total amount in controversy in excess of $5,000,000.

32.     Claims for Breach of Contract.  Plaintiffs bring claims for breach of express contract and breach of implied contract.  [Compl., ¶¶ 122-26 (Breach of Implied Contract); ¶¶ 127-31 (Breach of (Express) Contract).]  Plaintiffs first claim Morley breached an implied contract formed between it and class members when it failed to safeguard class members' PII, which they claim they and class members would not have provided "in the absence of [an] implied contract between them and [Morley]."  [*Id.* at ¶¶ 123-26.]  Plaintiffs also claim that that Morley breached the (express) written agreement they and class members had with Morley based upon Morley's "Notice of Privacy Practices," in which Morley allegedly agreed to "maintain the security of its patients' personal, health, and financial information," and in which Morley "specifically promised that it would notify [a] client 'at the time of data collection or transfer if [his or her] data w[ould] be shared with a third party . . .'"  [*Id.* at ¶¶ 128-30.]

33.     Plaintiffs' Complaint contains no allegations that would support or suggest the amount in damages they or any of the putative class members allegedly sustained as result of Morley's breach of contract.  Therefore, Morley does not include in the calculation of the total amount in controversy Plaintiffs' or class members' alleged breach of contract damages.  However, when Plaintiffs' and

putative class members' alleged breach of contract damages are combined with the damages alleged under the other claims alleged in the Complaint, the amount in controversy further exceeds CAFA's $5,000,000 threshold.

34.     Claim for Violation of Michigan's Identity Theft Protection Act § 445.72 *et seq.*  Plaintiffs allege that Morley violated Michigan's Identity Theft Protection Act ("MITPA"), Mich. Comp. Law § 445.72.  [Compl., ¶¶ 102-09.] Specifically, Plaintiffs allege that Morley was "required to accurately notify Plaintiffs and Class Members if it discover[ed] a security breach, or receive[d] notice of a breach (where unencrypted and unredacted PII was accessed or acquired by unauthorized persons), without unreasonable delay" pursuant to Mich. Comp. Law § 445.72(1), and that Morley failed to do so following the Ransomware Attack. [*Id.* at ¶¶ 103, 106-07.]  As a result, Plaintiffs claim that they and the other class members "suffered [unidentified] damages."  [*Id.* at ¶ 108.]  Plaintiffs also "seek relief under Mich. Comp. Laws §, 445.72(13), including, but not limited to, a civil fine of up to $250 for each violation" of MITPA.  [*Id.* at ¶ 109.]

35.     The MITPA does not provide a private right of action, and, therefore, Plaintiffs have no claim under the MITPA.  Nevertheless, based solely on Plaintiffs' allegations, the damages claimed by Plaintiffs under the MITPA claim, combined with the damages alleged under the other claims alleged in the Complaint, demonstrate that the amount-in-controversy is greater than $5,000,000.

– 16 –

Specifically, taking into account Plaintiffs' request for an unidentified amount of damages under MITPA and statutory damages under Mich. Comp. Law § 445.72(13)[6] (which requires a defendant "to pay a civil fine of not more than $250.00 for each failure to provide notice" of a security breach, subject to the $750,000 cap set forth in Mich. Comp. Law § 445.72(14)) further shows that the amount in controversy would exceed CAFA's $5,000,000 threshold if considered for purposes of calculating the amount in controversy under CAFA.

36.    <u>Prayer for Injunctive Relief</u>.  Courts in the Sixth Circuit have included the costs of fulfilling a plaintiff's demand for injunctive relief in assessing whether the amount in controversy has been met under certain circumstances.  *See, e.g.*, *Cleveland Housing Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 560 (6th Cir. 2010) (observing that "the costs of complying with an injunction . . . may establish the amount-in-controversy") (citation omitted); *White*, 729 F. Supp. 2d at 902.

37.    Here, Plaintiffs seek "injunctive relief," including an order compelling Morley to "(i) provide credit monitoring for all class members; (ii) provide identity theft insurance; (iii) institute security protocols in compliance with the appropriate

---

[6] Statutory penalties automatically awarded under statute may be considered for purposes of calculating the amount in controversy. *White v. Loomis Armored US, Inc.*, 729 F. Supp. 2d 897, 902 (E.D. Mich. 2010) (citation omitted); *see also Vanyo v. CitiFinancial, Inc.*, No. 1:06CV2943, 2007 WL 1795959, at *2 (N.D. Ohio June 20, 2007).

standards; and (iv) submit to periodic compliance audits by a third party regarding the security of consumers' personal identifying information in its possession, custody, and control." [Compl., Prayer for Relief.] Therefore, the alleged costs of implementing additional cyber-security policies and procedures, as well as the costs necessary to fulfill the other injunctive relief demands, should be considered when assessing the amount in controversy. *See, e.g.*, *S. Sts. Police Benevolent Ass'n, Inc. v. Second Chance Body Armor, Inc.*, 336 F. Supp. 2d 731, 734-35 (W.D. Mich. 2004). Although there are no allegations in the Complaint which allow Morley to calculate the cost of the injunctive relief requested, when the costs of the requested injunctive relief are combined with Plaintiffs' and putative class members' damages under the other claims discussed previously, the amount in controversy exceeds the $5,000,000 threshold.

38. <u>Other Claims</u>. In addition to the damages discussed above, Plaintiffs also bring a claim for unjust enrichment, and allege that they suffered generalized damages for their other claims, including "ongoing, imminent, impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm"; "actual identity theft crimes, fraud and abuse, resulting in monetary loss and economic harm; and other forms of relief not discussed, including, *inter alia*, "other economic harm." [Compl., Prayer for Relief; ¶¶ 9, 85, 110-21.] Plaintiffs seek

compensation for these allegations and also assert they are entitled to a "constructive trust." [*Id.* at ¶ 120.]

39.     No allegations in the Complaint allow Morley to calculate with specificity the amount of these alleged damages and relief.  However, Morley underscores these allegations to the Court as further evidence that the amount in controversy exceeds $5,000,000, as already established above.  *See, e.g.*, *Cowit v. CitiMortgage, Inc.*, No. 1:12–cv–869, 2013 WL 142893, at *6 (S.D. Ohio Jan. 11, 2013) (finding "ample evidence" to find that alleged amount in controversy exceeded $5 million when court considered plaintiff's request for "injunctive and declaratory relief, punitive damages, and attorneys[sic] fees, [all of which] must also be considered in determining the amount in controversy" (citation and internal quotation marks omitted)); *England v. Advanced Auto Stores Co.*, No. 1:07–CV–00174, 2008 WL 4372902, at *2 (W.D. Ky. Sept. 22, 2008) (finding that it "c[ould] be reasonably deduced from the allegations in the complaint that the amount in controversy more likely than not exceed[ed] $5 million [because] the class consist[ed] of at least 1,032 employees, so it would only take an average of less than $5,000 in controversy per employee to reach the requirement set forth by CAFA").  *See also Abdale v. N. Shore-Long Island Jewish Health Sys., Inc.*, No. 13–CV–1238 (JS)(WDW), 2014 WL 2945741, at *6 (E.D.N.Y June 30, 2014) (finding CAFA jurisdiction met in data breach class action when "it seem[ed] clear

. . . that Plaintiffs' additional claims for actual damages and equitable relief far exceed[ed] $5 million [because] [a]lthough they d[id] not provide specific monetary demands, Plaintiffs assert[ed] a claim for actual damages to cover losses, out-of-pocket expenses, and 'the burden and expense of comprehensive credit monitoring for more than one year into the future' and also s[ought] equitable relief. Given the size of the purported class (which [wa]s alleged to be in the thousands) and the expansive nature of Plaintiffs' claimed damages, it [was] hard to see how the amount-in-controversy d[id] not exceed $5 million in actual damages and equitable relief . . .").

40.     Accordingly, because the case was pled as a class action, and because minimal diversity, class size, and the amount in controversy requirements of CAFA are satisfied, Morley has properly removed the State Court Action to this Court.

## **NOTICE**

41.     As required by 28 U.S.C. § 1446(d), Morley is providing written notice of the filing of this Notice of Removal to Plaintiffs and is filing a copy of this Notice of Removal with the Clerk of the Tenth Judicial Circuit Court.

WHEREFORE, Defendant Morley Companies, Inc. removes the State Court Class Action from the Tenth Judicial Circuit Court, State of Michigan, to the United States District Court for the Eastern District of Michigan.

Dated:      March 31, 2022                Respectfully submitted,

                                          BAKER & HOSTETLER LLP

                                          By:  */s/ Casie D. Collignon*
                                               Casie D. Collignon
                                               ccollignon@bakerlaw.com
                                               1801 California Street, Suite 4400
                                               Denver, CO  80202
                                               Telephone: 303.861.0600
                                               Facsimile:  303.861.7805

                                               Matthew D. Pearson
                                               mpearson@bakerlaw.com
                                               600 Anton Blvd., Suite 900
                                               Costa Mesa, CA 92626
                                               Telephone: 714.754.6600
                                               Facsimile:  714.754.6611

                                               James A. Sherer
                                               jsherer@bakerlaw.com
                                               45 Rockefeller Plaza
                                               New York, NY 10111
                                               Telephone: 212.589.4200
                                               Facsimile:  212.589.4201

                                               Michael G. Brady (P57331)
                                               mbrady@wnj.com
                                               Warner Norcross + Judd LLP
                                               2715 Woodward Avenue, Suite 300
                                               Detroit, MI  48201
                                               Telephone: 313.546.6032
                                               Facsimile:  313.263.6855

                                               Jonathan E. Lauderbach (P51313)
                                               jlauderbach@wnj.com
                                               Warner Norcross + Judd LLP
                                               715 E. Main Street, Suite 110
                                               Midland, Michigan 48640-5382
                                               Telephone: 989.698.3701
                                               Facsimile: 989.486.6101

                                               *Counsel for Defendant Morley Companies,*
                                               *Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct of the foregoing **NOTICE OF REMOVAL**

was filed and serve on all counsel of record on this 31st day of March 2022 via the

Court's ECF system.


*/s/ Casie D. Collignon*

# Exhibit A to
# Notice of Removal

Approved, SCAO

| | Original - Court | 2nd copy - Plaintiff |
| --- | --- | --- |
| | 1st copy - Defendant | 3rd copy - Return |

**STATE OF MICHIGAN**

TENTH **JUDICIAL DISTRICT / JUDICIAL CIRCUIT / COUNTY PROBATE**

**SUMMONS**

**CASE NO.**

22-CU0585-CZ-5

Hon. Darnell Jackson

**Court address**
111 S. Michigan Avenue, Saginaw, MI 48602

**Court telephone no.**
(989) 790-5470

Plaintiff's name(s), address(es), and telephone no(s).
EDWARD CABLE, CAROLE DANGELO, SOPHIA MARKS, ALBERT SHEARER, AND REBECCA YOUNK, individually and on behalf of all others similarly situated,

v

Defendant's name(s), address(es), and telephone no(s).
MORLEY COMPANIES, INC.,

CIRCUIT COURT RECORDS OFFICE
SAGINAW, MICHIGAN
FILED

Plaintiff's attorney, bar no., address, and telephone no.
Kevin J. Cole (P78749)
KJC Law Group, A.P.C.
607 Shelby Street, Suite 700-1135
Detroit, MI 48226
Telephone: (310) 861-7797

FEB 1 7 2022

VANESSA GUERRA
SAGINAW COUNTY CLERK

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
| --- | --- | --- |
| 2/17/22 | 5/9/22 | Vanessa Guerra |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (9/19) **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

**PROOF OF SERVICE**

| SUMMONS |
| --- |
| Case No. |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
| --- | --- | --- |
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that:  (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
| --- | --- | --- |
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
| --- | --- | --- |
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
| --- | --- | --- | --- | --- |
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
Date

My commission expires: _____   Signature: _____
Date                                                                Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____ .
Signature

STATE OF MICHIGAN
TENTH CIRCUIT COURT

---

EDWARD CABLE, CAROLE DANGELO,  :
SOPHIA MARKS, ALBERT SHEARER,  :
AND REBECCA YOUNK, individually and  :
on behalf of all others similarly situated,  :  No.: 22-040585-CZ-5
                                             :
          Plaintiffs,                        : JURY TRIAL DEMANDED
                                             :
v.                                           :
                                        :Hon.    Darnell Jackson
MORLEY COMPANIES, INC.,                      :          (P34737)
                                             :
          Defendant.

---

Kevin J. Cole (P78749)
KJC Law Group, A.P.C.
607 Shelby Street, Suite 700-1135
Detroit, MI 48226
Telephone: (310) 861-7797
Facsimile: (818) 994-9200
kevin@kjclawgroup.com

Nicholas A. Migliaccio
Jason S. Rathod
Migliaccio & Rathod LLP
412 H Street NE, Ste. 302
Washington, DC 20002
Tel: (202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

*Counsel for Plaintiffs and the Class*

CIRCUIT COURT RECORDS OFFICE
SAGINAW COUNTY MICH
FILED

FEB 1 7 2022

VANESSA GUERRA
SAGINAW COUNTY CLERK

**CLASS ACTION COMPLAINT**

Plaintiffs Edward Cable ("Mr. Cable"), Carole Dangelo ("Mrs. Dangelo"), Sophia Marks ("Ms. Marks"), Albert Shearer ("Mr. Shearer"), and Rebecca Younk ("Ms. Younk") (collectively, "Plaintiffs"), on behalf of themselves individually and on behalf of all others similarly situated, through the undersigned counsel, hereby allege the following against Defendant Morley Companies, Inc. ("Defendant"). Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiffs specifically allege as follows:

## NATURE OF THE ACTION

1.      The Defendant in this action is a business services provider to healthcare organizations and, as such, it is entrusted with some of the most sensitive and personal information imaginable. Applicable law and industry standards require Defendant to implement security measures sufficient to protect such information from disclosure to hackers or other unauthorized parties. Defendant failed to meet these requirements, and Plaintiffs brings this class action to redress the harm caused by Defendant's failures.

2.      Defendant is a business services company headquartered in Saginaw, Michigan that processes patient information for health plans, as well as other employee data. In the course of its business, Defendant collects patient and employee data and maintains databases of sensitive and personal information obtained from these parties, including Plaintiffs and the Class (defined below).

3.      Defendant failed to implement adequate technical safeguards and train its employees to protect the confidential information of various health plan and employee information. Because of this, Defendant allowed the sensitive personal information of at least 500,000 individuals to be accessed by unauthorized third parties (the "Breach"). This personal information included individuals' medical information (including treatment and diagnostic information, as well as insurance information), personal information (*e.g.*, Social Security numbers and addresses), and/or other protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (collectively, their "Personal Identifiable Information" or "PII").

4.      The Breach occurred when, starting in August of 2021, Defendant determined that a ransomware

2

attack on its data systems prevented access to certain files and folders within the company's database. These files, in turn, contained sensitive PII and were accessed by an unauthorized actor.

5.       According to Defendant, the investigation into the incident ran until January 18, 2022. Despite this, Defendant's systems were exposed to the ransomware attack on or about August of 2021, and it wasn't until February 1, 2022 that Defendant's cybersecurity consultants "concluded their investigation" and began notifying Plaintiffs and the Class members through mailed notification letters for the first time.

6.       Plaintiffs Edward Cable, Carole Dangelo, Sophia Marks, Albert Shearer, and Rebecca Younk received copies of these letters addressed to them in late January or early February of 2022 .

7.       Defendant's security failures enabled the criminals behind the Breach to steal PII from Defendant's computer systems and put Plaintiffs and the Class members at serious and ongoing risk of identity theft. Defendant's acts and omissions have caused ongoing loss to Plaintiffs and Class members from, inter alia, the significant time spent attempting to address, mitigate, and monitor the present and future consequences of the Breach, including, as appropriate, review of records for fraudulent charges and healthcare services billed for but not received, cancellation of payment cards, purchase of credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, implementation of credit freezes, and the stress of managing issues resulting from the Breach.

8.       The Breach was caused and enabled by Defendant's violation of its obligations under the law and failure to abide by industry standards and its own policies in implementing adequate security measures. Had Defendant implemented adequate security measures, the Breach could have been prevented or mitigated. Defendant was aware that healthcare information has been increasingly targeted by cybercriminals.

9.       As a result of Defendant's actions, Plaintiffs have been forced to take remedial steps to protect themselves from future loss, including dedicating significant time that they otherwise would not have in making frequently checking their accounts. Indeed, all of the Class members are currently at a very high risk of fraud or identity theft, and it is reasonable and necessary for them to take protective measures, like the purchase of a credit monitoring service, to prevent and mitigate future loss.

10.     Some of these injuries have already materialized in Plaintiffs' case. Plaintiff Dangelo, for example, discovered on February 6, 2022 through the identity monitoring service on her joint Discover credit card with her husband that their PII had been found for sale on the dark web, a known marketplace that hackers use to buy and sell information used to perpetrate identity theft.

11.     Additionally, Ms. Marks has experienced an influx of spam calls asking her to provide various medical details to people who claim to be health insurance providers, doctors, or other healthcare professionals related to services she did not request or receive in the past. These spam calls are likely attempts by cybercriminals to obtain additional PII from Ms. Marks, which can then be used in combination with the information stolen from the ransomware attack on Defendant's systems to perpetrate additional fraud.

12.     Defendant's wrongful actions and/or inaction constitute common law negligence, and Plaintiffs bring claims of negligence per se, negligent misrepresentation, violation of the Michigan Data Breach Prompt Notification Law, unjust enrichment, breach of contract, and breach of implied contract.

13.     Plaintiffs, on behalf of themselves and on behalf of the Class, seek damages, injunctive relief, and attorneys' fees and costs.

## JURISDICTION AND VENUE

14.     The Tenth Circuit Court, State of Michigan has subject matter jurisdiction over the claims here.

15.     The Tenth Circuit Court, State of Michigan has personal jurisdiction over the parties here.

16.     Plaintiffs, and the class they seek to represent, seeks damages in excess of $25,000.

17.     The Tenth Circuit Court, State of Michigan is a proper venue for the claims in this action pursuant to MCL 600.1629(1)(a) and 600.1621.

18.     Venue is proper in this Court because the actions and omissions giving rise to the claims pled in this Complaint substantially occurred in and around Saginaw, Michigan.

## PARTIES

19.     Plaintiff Edward Cable is a citizen of Michigan and resides in Traverse City, Michigan. He received a letter from Defendant in early February of 2022 alerting him to the fact that his information was stolen

4

in the ransomware attack. He has not received any communications from Defendant regarding exactly how much of his information was included in the breach, or indeed how he may have been associated with Morley Companies in the first place.

20.     Plaintiff Carole Dangelo is a citizen of Michigan and resides in Northville, Michigan. She received a letter from Defendant in early February of 2022 alerting her to the fact that her information was stolen in a ransomware attack. She has not received any communications from Defendant regarding exactly how much of her information was included in the breach, or indeed how she may have been associated with Morley Companies in the first place.

21.     Plaintiff Sophia Marks is a citizen of Michigan and resides in Southfield, Michigan. she received a letter from Defendant in early February of 2022 alerting her to the fact that her information was stolen in the ransomware attack. She has not received any communications from Defendant regarding exactly how much of her information was included in the breach, or indeed how she may have been associated with Morley Companies in the first place.

22.     Plaintiff Albert Shearer is a citizen of Michigan and resides in Bloomfield, Michigan. He received a letter from Defendant in early February of 2022 alerting him to the fact that his information was stolen in the ransomware attack. He has not received any communications from Defendant regarding exactly how much of his information was included in the breach, or indeed how he may have been associated with Morley Companies in the first place.

23.     Plaintiff Plaintiff Rebecca Younk is a citizen of Michigan and resides in Bay City, Michigan. Ms. Younk was an employee at Morley Companies for approximately four months in 2015 as a call center representative. She received a letter from Morley in January of 2022 alerting her to the fact that her information was stolen in the ransomware attack. The information Morley Companies stored about Ms. Younk that was accessed by the unauthorized actor included her: "name, date of birth, social security number, driver's license number, and Health Information."

24.     Defendant Morley Companies, Inc. is a corporation organized and existing under the laws of the

5

State of Michigan with a principal place of business at One Morley Plaza, Saginaw, Michigan 48603.

## FACTUAL ALLEGATIONS

### A.    Background

25.    PII is a valuable commodity. It is sought by legitimate businesses to help better understand the

market and target advertising, but it is also coveted by criminals who use it to commit fraud and theft.

The Federal Trade Commission ("FTC") has recognized that consumer data is a new and valuable form

of currency. Pamela Jones Harbour, former Commissioner of the FTC, observed that:

> Most consumers cannot begin to comprehend the types and amount of
> information collected by businesses, or why their information may be
> commercially valuable. Data is currency. The larger the data set, the greater
> potential for analysis—and profit.[1]

Consumers' personal data supports a $26 billion per year online advertising industry in the United States.[2]

26.    Criminals also value PII as a means to commit theft (using, for example, bank account infor-

mation) or to effectuate identity fraud (with the help of, *e.g.*, a Social Security number, name, and address).

27.    The United States Government Accountability Office noted in a June 2007 report on data

breaches ("GAO Report") that identity thieves use identifying data such as Social Security numbers to

open financial accounts, receive government benefits and incur charges and credit in a person's name.[3]

As the GAO Report states, this type of identity theft is the most harmful because it often takes some time

for the victim to become aware of the theft, and the theft can impact the victim's credit rating adversely.

28.    In addition, the GAO Report states that victims of identity theft will face "substantial costs and

inconveniences repairing damage to their credit records" and their "good name."[4]

---

[1] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), *available at* http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited April 27, 2020).

[2] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, WALL STREET JOURNAL (Feb. 28, 2011), *available at* http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited April 27, 2020).

[3] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent Is Unknown* (June 2007), United States Government Accountability Office, *available at* https://www.gao.gov/new.items/d07737.pdf (last visited April 27, 2020).

[4] *Id.* at 2, 9.

29.     Identity theft victims frequently are required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and financial fraud.

30.     There may be a time lag between when PII is stolen and when it is used.

31.     According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[5]

32.     With access to an individual's PII, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver license or official identification card in the victim's name but with the thief's picture; using the victim's name and Social Security number to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name. Identity thieves may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[6]

33.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "dark web" black market for years. As a result of recent large-scale data breaches, identity thieves and cybercriminals have openly posted stolen credit card numbers and Social Security numbers on various websites, making the information publicly available.

34.     A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-

---

[5] *Id.* at 29.
[6] *See* Federal Trade Commission, Warning Signs of Identity Theft, *available at* https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited April 27, 2020).

7

pocket costs for healthcare they did not receive in order to restore coverage.[7]

35.     Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole. Medical databases are especially valuable to identity thieves. According to a 2012 Nationwide Insurance report, "[a] stolen medical identity has a $50 street value—whereas a stolen Social Security number, on the other hand, only sells for $1."[8]

36.     A recent survey conducted by Black Book Research ("Black Book Study") found that, of the 733 healthcare organizations surveyed, 93 percent had experienced a data breach in the last three years. "Not only has the number of attacks increased; more than $300 million of records have been stolen since 2015, affecting about one in every ten healthcare consumers."[9]

37.     The Black Book Study merely confirms something that has been widely known for years: cyber-criminals target the healthcare sector. A 2015 data breach report issued by the credit reporting company Experian repeatedly warns that the healthcare sector is susceptible to cybercrime:

> We expect healthcare breaches will increase — both due to potential eco-nomic gain and digitization of records. Increased movement to electronic medical records (EMRs), and the introduction of wearable technologies introduced millions of individuals into the healthcare system, and, in re-turn increased, the potential for data breaches. Healthcare organizations face the challenge of securing a significant amount of sensitive information stored on their network, which combined with the value of a medical iden-tity string makes them an attractive target for cybercriminals.[10]

38.     Similarly, The New York Times has reported that "[t]he threat of a hacking is particularly acute in the health care and financial services industries, where companies routinely keep the most sensitive

---

[7] See Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, (Mar. 3, 2010), *available at* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims (last visited April 27, 2020).
[8] See *Study; Few Aware of Medical Identity Theft Risk*, CLAIMS JOURNAL (June 14, 2012), *available at* http://www.claimsjournal.com/news/national/2012/06/14/208510.htm (last visited April 27, 2020).
[9] Jessica Davis, *Data Breaches Will Cost Healthcare $4Bin 2019, Threats Outpace Tech*, CYBERSECURITY NEWS (Nov. 5, 2019), *available at* https://healthitsecurity.com/news/data- breaches-will-cost-healthcare-4b-in-2019-threats-outpace-tech (last visited April 27, 2020).
[10] Experian, *2015 Second Annual Data Breach Industry Forecast* (2015), *available at* https://www.experian.com/assets/data-breach/white-papers/2015-industry-forecast-experian.pdf (last visited April 27, 2020).

8

personal information about their customers on large databases."[11]

39.     The type of data stored by healthcare providers is far more valuable to identity thieves than credit card information and other PII stolen from retailers and other businesses that store customer information. While a credit card can be easily cancelled or replaced, these other forms of sensitive PII cannot. Moreover, "Fraudsters can use this data to create fake IDs to buy medical equipment or drugs, or combine a patient number with a false provider number and file fictional claims with insurers."[12] For this reason, "Medical information can be worth ten times more than credit card numbers on the deep web."[13]

40.     Because the healthcare service industry amasses large troves of PII, including highly desirable medical information, they must be vigilant in ensuring that PII is protected from hackers and other cybercriminals and that outside vendors and businesses are not permitted to access patients' information.

41.     As a corollary to the uses for PII described above, consumers value keeping their PII private. Researchers have shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[14]

42.     When consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use—two concerns at issue here—they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[15]

---

[11] *See* Reed Abelson & Matthew Goldstein, *Millions of Quest Customers Targeted in Cyberattack*, N.Y. TIMES (Feb. 10, 2015), *available at* https://www.nytimes.com/2015/02/05/business/hackers-breached-data-of-millions-insurer-says.html (last visited April 27, 2020).

[12] Aatif Sulleyman, *NHS Cyber Attack: Why Stolen Medical Information is so Much More Valuable than Financial Data*, INDEPENDENT (Friday May 12, 2017), *available at* https://www.independent.co.uk/life-style/gadgets-and-tech/news/nhs-cyber-attack-medical-data- records-stolen-why-so-valuable-to-sell-financial-a7733171.html (last visited April 27, 2020).

[13] *Id.*

[14] Hann et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited April 27, 2020); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).

[15] *Id.*

43.     Given these facts, any company that transacts business with a consumer and then compromises

the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the con-

sumer's transaction with the company.

**B. Defendant Failed to Protect the PII of Plaintiffs and the Class from Cybercriminals**

44.     Defendant offers data processing services to health insurance plans throughout the country.

45.     These services encompass the storage and maintenance of electronic data containing PII, includ-

ing that of Plaintiffs and the Class.

46.     On February 2, 2022, Defendant announced that after it became aware of the ransomware attack

on August, 1, 2021, it conducted an investigation that ran through February 1, 2022, when it began noti-

fying current and former employees, as well as various clients, that their data had been stolen.  Defendant

posted the following notice on its website:[16]

> Saginaw, Michigan: February 2, 2022 – Morley Companies, Incorporated ("Morley"), a provider
> of various business services, has learned of a data security incident that may have impacted data
> belonging to current employees, former employees and various clients. Morley has sent notifica-
> tion of this incident to potentially impacted individuals and has provided resources to assist them.
>
> The incident began on August 1, 2021, when Morley's data became unavailable. Upon receipt of
> this information, Morley immediately took steps to secure its environment and commenced an
> investigation to determine what happened and to identify the specific information that may have
> been impacted. In so doing, Morley engaged leading independent cybersecurity experts for assis-
> tance. As a result, Morley learned that additional data may have been obtained from its digital
> environment. Morley thereafter began collecting contact information needed to provide notice to
> potentially affected individuals, which was completed in early 2022.
>
> Morley is not aware of any evidence indicating the misuse of any information potentially involved
> in this incident. However, beginning on February 1, 2022, notice of this incident was provided to
> potentially impacted individuals. The notice includes information about the incident and about
> the steps that potentially impacted individuals can take to protect their information. Morley also
> provided access to complimentary credit monitoring and identity theft protection services to indi-
> viduals whose Social Security numbers may have been involved in the incident.
>
> The following personal and protected health information may have been involved in the incident:
> name, address, Social Security number, date of birth, client identification number, medical diag-
> nostic and treatment information, and health insurance information.
>
> Morley has taken steps in response to this incident and has made alterations to its cyber environ-
> ment to help prevent similar incidents from occurring in the future.

---

[16] Morley Companies, Inc., *Morley Notifies Clients of Data Security Incident*, https://www.mor-
leynet.com/about/cyber-security-incident/ (last visited Feb. 9, 2022).

Morley has established a toll-free call center to answer questions about the incident and to address related concerns. Call center representatives are available Monday through Friday between 9 a.m. and 9 p.m. Eastern time and can be reached at 833.325.1785.

The privacy and protection of personal and protected health information is a top priority for Morley, which deeply regrets any inconvenience or concern this incident may cause.

***While we are not aware of the misuse of any potentially affected individual's information, we are providing the following information to help those wanting to know more about steps they can take to protect themselves and their personal information:***

**What steps can I take to protect my personal information?**

- Please notify your financial institution immediately if you detect any suspicious activity on any of your accounts, including unauthorized transactions or new accounts opened in your name that you do not recognize. You should also promptly report any fraudulent activity or any suspected incidents of identity theft to proper law enforcement authorities.
- You can request a copy of your credit report, free of charge, directly from each of the three nationwide credit reporting agencies. To do so, free of charge once every 12 months, please visit www.annualcreditreport.com or call toll free at 877.322.8228. Contact information for the three nationwide credit reporting agencies is listed below.
- You can take steps recommended by the Federal Trade Commission to protect yourself from identify theft. The FTC's website offers helpful information at www.ftc.gov/idtheft.
- Additional information on what you can do to better protect yourself is included in your notification letter.

47.     As discussed in more detail below, Defendant represented to Plaintiffs and the Class members that their PII was safe with Defendant. Defendant's failure to institute appropriate protective measures regarding the PII stolen in the Breach is especially egregious because it is well known that PII is a valuable commodity that is coveted by cyber criminals, who regularly attack organizations that posses large collections of such data, and that medical- and health-related data is among the most valuable kind of PII. Defendant should have known it was likely to be targeted by cyber criminals and should have had appropriate safeguards in place to protect the PII in its possession.

### C. **Defendant Represented that It Was Adequately Safeguarding Plaintiffs' PII**

48.     Defendant represented that all patient PII it collected, whether in connection with healthcare services or health insurance plans, would be adequately protected from unlawful disclosure. In various polices discussed below, Defendant described its obligations and commitments to patient privacy and detailed some of the security measures purportedly protecting PII from disclosure.

11

49.     Defendant's maintains on its website a notice of privacy practice,[17] providing that:

> Morley's Chief Privacy Officer ensures that obligations arising from the Privacy Policy are enforced and that laws, such as those in the United States, Canada, the European Union ("EU"), the European Economic Area ("EEA") and Australia, are observed.

50.     Defendant made similar representations regarding the safety of information submitted by patients and employees via Defendant's website. Defendant's Website Privacy Policy assures the reader that, "The Company takes the privacy and security of individuals and their personal information very seriously, and we take every reasonable measure and precaution to protect and secure the personal data that we process.."[18] The policy further states:

> We are also responsible for all personal information that we provide to subcontractors/processors and agents for processing to help us in serving our clients. It is the responsibility of the Morley staff person proposing or supervising such activities to ensure that the written contract with the outside party will afford a comparable level of protection while the personal information is being processed by such third party. This will usually mean the provision of a copy of this Privacy Policy to such third party and the written acknowledgement from such third party that it will be bound by the policy.

51.     Defendant also failed to implement adequate monitoring and auditing systems as the systems were locked by ransomware, accessible by unauthorized parties for months—despite the fact that Defendant apparently knew about the ransomware as early as August of 2021.

52.     At all relevant times, Defendant was legally obligated to protect the PII of Plaintiffs and the Class and, in the event of a breach, to timely notify Plaintiffs and the Class of such a breach. Defendant's failure to institute appropriate protective measures regarding the PII stolen in the Breach is especially egregious because it is well known that PII is a valuable commodity to cybercriminals, who regularly attack organizations that possess large collections of such data, and that medical- and health-related data is among the most valuable kinds of PII. Defendant should have known it was likely to be targeted by cybercriminals

---

[17] Morley Companies, *Privacy Policy*, https://www.morleynet.com/About/Privacy-Policy/ (last visited Feb. 9, 2022)
[18] *Id.*

12

and should have implemented appropriate safeguards to protect the PII in its possession.

### D. Defendant Was Required by Law to Protect the PII of Plaintiffs and the Class

53.     Defendant also violated duties owed to Plaintiffs and the Class members under federal law, including HIPAA and the Federal Trade Commission Act.

54.     HIPAA and implementing regulations require Defendant to establish procedures to keep secure certain PII it possesses, including, without limitation, names and Social Security Numbers. HIPAA requires Defendant to implement reasonable safeguards for such information, which Defendant did not.[19]

55.     Defendant failed to honor its obligations under the law and the duties created by its own policies and promises and representations to Plaintiffs and the Class by not:

a.      Maintaining an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.      Adequately protecting Plaintiff's and the Class members' PII;

c.      Ensuring the confidentiality and integrity of electronic protected health information it created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.      Implementing technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.      Implementing policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.      Implementing procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.      Protecting against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. § 164.306(a)(2);

---

[19] See 45 C.F.R. § 164.530(c)(1); 45 C.F.R. § 164.306(a) ("Covered entities and business associates must do the following: (1) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits. (2) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information. (3) Protect against any reasonably anticipated uses or disclosures of such information    ").

h.      Protecting against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

i.      Ensuring compliance with the electronically protected health information security standard rules by its workforces, in violation of 45 C.F.R. § 164.306(a)(4); and/or

j.      Training all members of its workforces effectively on the procedures with respect to protected health information as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

56.     In addition, Defendant had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential information.

57.     Defendant's data security obligations and promises were particularly important given the substantial increase in data breaches—particularly those impacting the healthcare industry—during the past five years, which were widely known to the public and to anyone in Defendant's industries. Given that Defendant operates in an industry plagued by data breaches and possessed a large trove of valuable data, it was or should have been aware that it was a likely target for cybercriminals.

58.     Defendant was, or should have been, aware of these facts, but failed to institute appropriate safeguards to keep the PII within its possession and control safe from cybercriminals.

          E.  **Plaintiffs and the Class Members have been Injured by the Disclosure of their PII**

59.     Some portion of the monies paid by Plaintiffs and the Class to Defendant for data processing services was compensation for Defendant's compliance with industry-standard measures with respect to the collection and safeguarding of their PII—or, put another way, the cost of protecting the PII of Plaintiffs and the Class was "baked in" to the price Defendant charged for its services. Because Plaintiffs and the Class were denied privacy protections that they paid for and were entitled to receive, Plaintiffs and

14

the Class overpaid Defendant and thereby incurred actual monetary damages. Plaintiffs would have obtained data processing services from other suitable providers had Defendant disclosed that it failed to maintain adequate computer systems and data security practices to safeguard Plaintiffs' PII from theft.

60.    Plaintiffs and the Class have suffered additional injury in fact and actual damages including from the substantial lost time in monitoring their accounts and credit history (and in otherwise addressing the Breach) that they have spent as a result of the Breach and that they would not have in its absence. For example, since receiving notification of the Breach, Plaintiffs now constantly monitor their credit card transactions and credit history, which they did not have reason to do before the Breach. Moreover, Plaintiff Dangelo received a notification that her and her husband's PII was found on the dark web by the credit monitoring services that she received through a joint Discover credit card she owns with her husband. Additionally, Plaintiff Marks has received an influx of spam calls asking her to provide confidential medical details such as her patient number and insurance policy numbers. These are precisely the types of injury that other Class members can and will experience in the future through the loss of their PII.

61.    Plaintiffs and the Class suffered additional damages arising from the costs associated with identity theft, the increased risk of identity theft caused by Defendant's wrongful conduct, and the cost of acquiring credit monitoring services.

**CLASS ALLEGATIONS**

62.    In accordance with Michigan Court Rule 3.501, Plaintiffs bring this case as a class action on behalf of a Nationwide Class defined as follows:

> All persons whose PII was maintained by Defendant and that was compromised as a result of the Breach publicly disclosed in or about August of 2021 (the "Nationwide Class").

63.    In addition to and/or in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of the following Subclass:

> All residents of Michigan whose PII was maintained by Defendant and that was compromised as a result of the Breach publicly disclosed in or

15

about August 2021 (the "Michigan Subclass," collectively with the Nation-wide Class, the "Class").

64.     The Class is so numerous that joinder of all members is impracticable. The Class has hundreds of thousands of members. Moreover, the disposition of the claims of the Class in a single action will provide substantial benefits to all parties and the Court.

65.     There are numerous questions of law and fact common to Plaintiffs and the Class members. These common questions of law and fact include, but are not limited to, the following:

   a.   Whether Defendant's data security systems complied with all applicable legal requirements;

   b.   Whether Defendant's data security systems prior to the Breach met industry standards;

   c.   Whether Plaintiffs' and other Class members' PII was compromised in the Breach; and

   d.   Whether Plaintiffs and other Class members are entitled to damages.

66.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including data breach class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of other Class members.

67.     Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs suffered the same injury as the Class members—i.e., upon information and belief, Plaintiff's PII was compromised in the Breach.

68.     Defendant has engaged in a common course of conduct toward Plaintiffs and other Class members. The common issues arising from this conduct that affect Plaintiffs and the Class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

69.     A class action is the superior method for the fair and efficient adjudication of this controversy. The Class members' interests in individually controlling the prosecution of separate actions are low given the magnitude, burden, and expense of individual prosecutions against large corporations such as

Defendant. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits. Individualized litigation presents a potential for inconsistent or contradictory judgments, and also increases the delay and expense to all parties and the court system presented by the legal and factual issues of this case. By contrast, the class action procedure here will have no management difficulties. Defendant's records and publicly available records will easily identify the Class members. The same common documents and testimony will be used to prove Plaintiffs' claims as those of the Class.

### COUNT I
### NEGLIGENCE

70.    Plaintiffs incorporate by reference all of the above paragraphs, as though fully set forth herein.

71.    Defendant required Plaintiffs and the Class members to submit non-public PII, including names, addresses, and Social Security numbers, and in the course of Defendant's business it generated and stored highly sensitive medical and health-related information pertaining to Plaintiffs and the Class members.

72.    Defendant knew, or should have known, of the risks of collecting and storing the PII of the Class.

73.    Defendant had a duty of care to use reasonable means to secure and safeguard the PII it collected, generated, and stored to prevent disclosure of the information, and to guard the information from theft.

74.    Defendant's duty included a responsibility to implement a process by which it could detect a breach of its security systems in a reasonably expeditious manner and give prompt notice to those affected.

75.    Defendant also owed a duty of care to Plaintiffs and the Class members to provide security consistent with industry standards and the other requirements discussed herein, and to ensure that its systems and networks and the personnel responsible for them adequately protected its customers' PII.

76.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between it and the sensitive health-related information it processed. This duty is recognized by law, including but not limited to HIPAA and the FTCA. Only Defendant was in a position to ensure that its systems were sufficient to protect against the harm to Plaintiffs and the Class members.

77.     Defendant's duty to use reasonable security measures also arose under HIPAA, pursuant to which Defendant is required to "reasonably safeguard protected health information from any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." C.F.R. § 164.530(c)(1). The data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

78.     In addition, Defendant had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

79.     Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the common law and the statutes and regulations described above, but also because it is bound by, and has committed to comply with, industry standards for the protection of confidential PII.

80.     Defendant occupied a special relationship with Plaintiffs and the Class, who explicitly or implicitly agreed to keep safe and process Plaintiffs' confidential PII.

81.     Defendant breached its duties by failing to use reasonable measures to protect patients' PII.

82.     Defendant failed to disclose material information to Plaintiffs and the Class at the time they provided their PII, i.e., that Defendant did not have sufficient security or mechanisms to protect PII, and, in fact, represented that it employed adequate security measures.

83.     The negligent acts and omissions committed by Defendant include the following:

a.      failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class members' PII;

b.      failing to appropriately train its staff about the dangers of ransomware attacks;

c.      failing to adequately monitor the security of its network and systems;

d.     actively and knowingly misrepresenting or omitting disclosure of material information to Plaintiffs and the Class at the time they provided such PII that Defendant did not have sufficient security or mechanisms to protect PII;

e.     allowing unauthorized access to Plaintiff's and Class members' PII; and

f.     failing to recognize in a timely manner that Class members' PII had been compromised.

84.     It was foreseeable that Defendant's failure to use reasonable measures to protect PII would result in injury to Plaintiffs and other Class members. Further, the breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class members were reasonably foreseeable.

85.     It was therefore foreseeable that the failure to adequately safeguard PII would result in one or more of the following injuries to Plaintiffs and the Class members:

a.     ongoing, imminent, impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm;

b.     actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm;

c.     loss of the confidentiality of the stolen confidential data;

d.     the illegal sale of the compromised data on the black market (dark web);

e.     expenses and/or time spent on credit monitoring and identity theft insurance;

f.     time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts;

g.     decreased credit scores and ratings;

h.     lost work time;

i.     and other economic harm.

86.     Accordingly, Plaintiffs, individually and on behalf of all those similarly situated, seek an order declaring that Defendant's conduct constitutes negligence and awarding damages in an amount to be determined at trial.

## COUNT II

19

## NEGLIGENCE PER SE

87.    Plaintiffs incorporate the above allegations by reference.

88.    Pursuant to the Federal Trade Commission Act (15 U.S.C. §45), Defendant had a duty to provide fair and adequate data security practices to safeguard Plaintiffs' and Class members' PII.

89.    Pursuant to HIPAA (42 U.S.C. §1302d et. seq.), Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class members' PII.

90.    Defendant breached its duties to Plaintiffs and Class members under the Federal Trade Commission Act (15 U.S.C. § 45) and HIPAA (42 U.S.C. § 1302d et. seq.) by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiffs' and Class members' PII.

91.    Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

92.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class members, Plaintiffs and Class members would not have been injured.

93.    The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiffs and Class members to experience the foreseeable harms associated with the exposure of their PII.

94.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT III
## NEGLIGENT MISREPRESENTATION

95.    Plaintiffs incorporate the above allegations by reference.

96.    Defendant owed Plaintiffs and Class members a duty and occupied a special relationship with Plaintiffs and Class members, as Defendant's patients, and as described above.

97.    Defendant negligently prepared information and misrepresented material facts, pertaining to the provision of health care services, to Plaintiffs and Class members by representing that it would maintain

20

adequate data privacy and security practices and procedures to safeguard Plaintiffs' and Class members'
PII from unauthorized disclosure, release, data breaches, and theft.

98.     Companies in the healthcare industry have received multiple warnings of their vulnerability to
cyber attacks. Because Defendant was aware of the susceptibility of healthcare sector to cyber attacks and
also its own heavy reliance on email for sharing confidential information and other security vulnerabilities,
Defendant either knew or should have known its representations were untrue.

99.     In reasonable and justifiable reliance upon these misrepresentations, Plaintiffs and Class members
purchased healthcare services from Defendant.

100.    Had Plaintiffs and Class members, as reasonable persons, known of Defendant's inadequate data
privacy and security practices, or that Defendant was failing to comply with the requirements of federal
and state laws pertaining to the privacy and security of Class members' PII, they would not have purchased
healthcare services benefits from Defendant, and would not have entrusted their PII to Defendant.

101.    As a direct and proximate consequence of Defendant's negligent misrepresentations, Plaintiffs
and Class members have suffered the injuries alleged above.

## COUNT IV
### VIOLATIONS OF MICHIGAN'S DATA BREACH PROMPT NOTIFICATION LAW
### (MICH. COMP. LAWS ANN. § 445.72(1), et seq.)

102.    Plaintiffs incorporate the above allegations by reference.

103.    Defendant is required to accurately notify Plaintiffs and Class Members if it discovers a security
breach, or receives notice of a breach (where unencrypted and unredacted PII was accessed or acquired
by unauthorized persons), without unreasonable delay under Mich. Comp. Laws Ann. § 445.72(1).

104.    Defendant is a business that owns or licenses computerized data that includes personal infor-
mation as defined by Mich. Comp. Laws Ann. § 445.72(1).

105.    Plaintiffs' and Class Members' Personal Information (*e.g.*, Social Security numbers) includes per-
sonal information as covered under Mich. Comp. Laws Ann. § 445.72(1).

106.    Because Defendant discovered a security breach and had notice of a security breach (where

21

unencrypted and unredacted Personal Information was accessed or acquired by unauthorized persons), Defendant had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Mich. Comp. Laws Ann. § 445.72(4).

107.   Defendant has stated it was aware of a security breach in August when it began to investigate the ransomware attack. However, Defendant did not notify Plaintiffs and the Class until February, approximately seven months after it first learned of a security breach.

108.   As a direct and proximate result of Defendant's violations of Mich. Comp. Laws Ann. § 445.72(4), Plaintiffs and Class Members suffered damages.

109.   Plaintiffs and Class Members seek relief under Mich. Comp. Laws Ann. § 445.72(13), including, but not limited to, a civil fine of up to $250 for each violation.

### COUNT V
### UNJUST ENRICHMENT

110.   Plaintiffs incorporate the above allegations by reference.

111.   Plaintiffs and Class members conferred a monetary benefit on Defendant in the form of monies paid for the purchase of health services from Defendant prior to and during the period of the data breach.

112.   Defendant appreciates or has knowledge of the benefits it conferred on the class.

113.   The monies paid for the purchase of health services by Plaintiffs and the Class members to Defendant during the period of the data breach were supposed to be used by Defendant, in part, to pay for the costs of providing reasonable data security and protection to Plaintiffs and the Class members.

114.   Defendant failed to provide reasonable protection for the PII of Plaintiffs and Class members and, as a result, Plaintiffs and Class members overpaid Defendant for the services purchased.

115.   Had Plaintiffs and the Class known that Defendant would not adequately protect their PII, they would not have elected to purchase services from Defendant or would have paid less for the same services.

116.   Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and the Class members, because Plaintiffs and Class members paid for

22

adequate safeguards and security measures to protect their PII that Defendant did not provide.

117.    Plaintiffs and the Class have conferred directly upon Defendant an economic benefit in the nature of monies received and profits resulting from sales and unlawful overcharges to the economic detriment of Plaintiffs and the Class members.

118.    The economic benefit, including the monies paid and the overcharges and profits derived by Defendant and paid by Plaintiffs and the Class members, is a direct and proximate result of Defendant's unlawful practices as set forth in this Complaint.

119.    The financial benefits derived by Defendant rightfully belong to Plaintiffs and the Class members.

120.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiffs and the Class.

121.    Plaintiffs and the Class have no adequate remedy at law.

<u>COUNT VI</u>
BREACH OF IMPLIED CONTRACT

122.    Plaintiffs incorporate the above allegations by reference.

123.    When Plaintiffs and the Class members provided their PII to Defendant in order to receive services from them, Plaintiffs and the Class members entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such information and to notify Plaintiffs and the Class members in a timely and accurate manner that their data had been breached and compromised.

124.    Plaintiffs and the Class members would not have provided and entrusted their financial, health, and other PII to Defendant in the absence of the implied contract between them and Defendant.

125.    Plaintiffs and the Class members fully performed their obligations under the implied contracts.

126.    Defendant breached the implied contracts it made with Plaintiffs and the Class members by failing to safeguard and protect the PII of Plaintiffs and the Class members and by failing to provide timely and accurate notice to them that their PII was compromised in and as a result of the Breach.

///

23

## COUNT VII
## BREACH OF CONTRACT

127.    Plaintiffs incorporate the above allegations by reference.

128.    Defendant has a contractual obligation to maintain the security of its patients' personal, health, and financial information, which Defendant recognizes in its Notice of Privacy Practices where it addresses the consumers' "protected health information."

129.    Defendant also specifically promised that it would notify the client "at the time of data collection or transfer if your data will be shared with a third party and you will always have the option of not permitting the transfer. If you do not wish to allow your data to be shared, you can choose not to provide that information or use a particular service."

130.    Defendant breached these contractual obligations by failing to safeguard and protect the PII of Plaintiffs and the Class members, including through the dissemination of PII through the unauthorized disclosure of PII, including personal, health, and financial information, to unauthorized third parties.

131.    The losses and damages sustained by the Class as described herein were the direct and proximate result of the breaches of contracts between Defendant and Plaintiffs and the Class members.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests that the Court enter judgment against Defendant as follows:

A.    Certifying this action as a class action, with a Class as defined above;

B.    Awarding compensatory damages to redress the harm caused to Plaintiffs and the Class members in the form of, inter alia, overpayment, direct theft, identity theft, loss of unencumbered use of existing passwords, loss of passwords, expenses for credit monitoring and identity theft insurance, out-of-pocket expenses, and other harm. Plaintiffs and the Class members' damages were foreseeable by Defendant and exceed the minimum jurisdictional limits of this Court;

C.    Ordering injunctive relief including, without limitation, requiring Defendant to (i) provide credit

monitoring for all Class members, (ii) provide identity theft insurance, (iii) institute security protocols in compliance with the appropriate standards; and (iv) require Defendant to submit to periodic compliance audits by a third party regarding the security of consumers' personal identifying information in its possession, custody and control;

D.      Awarding Plaintiffs and the Class interest, costs and attorneys' fees; and

E.      Awarding Plaintiffs and the Class such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all questions of fact raised by the Complaint.

Dated: February 17, 2022                              Respectfully submitted,

                                                      _s/    Kevin J. Cole_
                                                      Kevin J. Cole (P78749)
                                                      KJC Law Group, A.P.C.
                                                      607 Shelby Street, Suite 700-1135
                                                      Detroit, MI 48226
                                                      Telephone: (310) 861-7797
                                                      Facsimile: (818) 994-9200
                                                      kevin@kjclawgroup.com

                                                      Nicholas A. Migliaccio*
                                                      Jason S. Rathod*
                                                      **MIGLIACCIO & RATHOD LLP**
                                                      412 H Street NE, Ste. 302
                                                      Washington, DC 20002
                                                      Tel: (202) 470-3520
                                                      nmigliaccio@classlawdc.com
                                                      jrathod@classlawdc.com

                                                      *Pro Hac Vice admission anticipated
                                                      Counsel for Plaintiffs and the Class

**STATE OF MICHIGAN**
**TENTH CIRCUIT COURT**

| | |
|---|---|
| EDWARD CABLE, CAROLE DANGELO, SOPHIA MARKS, ALBERT SHEARER, and REBECCA YOUNK, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>MORLEY COMPANIES, INC.,<br><br>    Defendant. | Case No. 22-046585-CZ-5<br><br>HON. DARNELL JACKSON<br><br>**STIPULATION TO EXTEND DEADLINE TO RESPOND TO COMPLAINT**<br><br>[Filed concurrently with Uncontested Order]<br><br>Complaint Filed:  February 17, 2022<br>Complaint Served: March 2, 2022 |

**TO THE HONORABLE COURT:**

Pursuant to Michigan Court Rules 2.107(E) and 2.119(D), Plaintiffs Edward Cable, Carole Dangelo, Sophia Marks, Albert Shearer, and Rebecca Younk (collectively, "Plaintiffs") and Defendant Morley Companies, Inc. ("Morley") hereby file this Stipulation to Continue Morley's responsive pleading deadline by 30 days to April 22, 2022 ("Stipulation") and accompanying Uncontested Order granting same. Good cause exists to grant this Stipulation and sign the Uncontested Order on the following grounds:

  1.  On February 17, 2022, Plaintiffs filed their complaint in this Court.

  2.  On March 2, 2022, Plaintiffs personally served Morley with the Summons and Complaint.

  3.  Pursuant to Michigan Court Rule 2.108(A)(1), Morley's deadline to file a response to the Complaint is March 23, 2022.

4.      This action is one of eight actions filed against Morley that arises out of the same act or occurrence.  The other seven actions are currently pending in the United States District Court for the Eastern District of Michigan.

5.      Plaintiffs and Morley have been meeting and conferring on how this case should proceed, including whether it should be removed to federal court.

6.      The parties believe that it would be waste of judicial and party resources to require Morley to draft and file a responsive pleading in this Court if the case is ultimately removed to federal court.

7.      Therefore, the Parties request that Court grant this Stipulation and sign the accompanying Uncontested Order continuing Morley's responsive pleading deadline by 30 days to April 22, 2022.

8.      This is the first request for a continuance of Morley's responsive pleading deadline.

**IT IS SO STIPULATED.**

Dated: March 23, 2022                    Respectfully submitted,

                                         BAKER & HOSTETLER LLP

                                         By: */s/ James A. Sherer*
                                         James A. Sherer (P71791)
                                         jsherer@bakerlaw.com
                                         45 Rockefeller Plaza
                                         New York, NY 10111
                                         Telephone: 212.589.4200
                                         Fax: 212.589.4201


                                         *Counsel for Defendant*
                                         *Morley Companies, Inc.*

Dated: March 23, 2022

Respectfully submitted,

KJC LAW GROUP, A.P.C.

By: */s/ Kevin J. Cole*
Kevin J. Cole (P78749)
kevin@kjclawgroup.com
607 Shelby Street, Suite 700-1135
Detroit, MI 48226
Telephone: 310.861.7797
Fax: 818.994.9200

*Counsel for Plaintiffs and the Class*

**STATE OF MICHIGAN**
**TENTH CIRCUIT COURT**

| | |
|---|---|
| EDWARD CABLE, CAROLE DANGELO, SOPHIA MARKS, ALBERT SHEARER, and REBECCA YOUNK, individually and on behalf of all others similarly situated, | Case No. 22-046585-CZ-5 |
| | HON. DARNELL JACKSON |
| Plaintiffs, | **UNCONTESTED ORDER GRANTING STIPULATION TO EXTEND DEADLINE TO RESPOND TO COMPLAINT** |
| v. | [Filed concurrently with Stipulation] |
| MORLEY COMPANIES, INC., | Complaint Filed:     February 17, 2022 |
| Defendant. | Complaint Served:  March 2, 2022 |

The Court, having read and considered Plaintiffs Edward Cable's, Carole Dangelo's, Sophia Marks', Albert Shearer's, and Rebecca Younk's (collectively, "Plaintiffs") and Defendant Morley Companies, Inc.'s ("Morley") Stipulation to Continue Morley's responsive pleading deadline by 30 days to April 22, 2022 ("Stipulation") and finding good cause therefor, hereby orders that:

1.   The Stipulation is GRANTED; and

2.   Morley's responsive pleading deadline is continued to April 22, 2022.

**IT IS SO ORDERED.**

Dated: March _____, 2022

_____
The Honorable Darnell Jackson

The following parties stipulate to entry of the above order.

By: */s/ James A. Sherer*
James A. Sherer (P71791)
jsherer@bakerlaw.com

45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200
Fax: 212.589.4201

*Counsel for Defendant*
*Morley Companies, Inc.*

KJC LAW GROUP, A.P.C.

By: */s/ Kevin. J. Cole*
Kevin J. Cole (P78749)
kevin@kjclawgroup.com
607 Shelby Street, Suite 700-1135
Detroit, MI 48226
Telephone: 310.861.7797
Fax: 818.994.9200

*Counsel for Plaintiffs and the Class*

AO 85 (Rev. 01/09)  Notice, Consent, and Reference of a Civil Action to a Magistrate Judge

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

|  |  |  |
|---|---|---|
| _____ | ) | Civil Action No. _____ |
| *Plaintiff* | ) |  |
| v. | ) | Honorable _____ |
| _____ | ) |  |
| *Defendant* | ) | Magistrate Judge _____ |

## NOTICE, CONSENT, AND REFERENCE OF A CIVIL ACTION TO A MAGISTRATE JUDGE

*Notice of a Magistrate Judge's availability.*  A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action (including a jury or nonjury trial) and to order the entry of a final judgment.  The judgment may then be appealed directly to the United States Court of Appeals like any other judgment of this court.  A Magistrate Judge may exercise this authority only if all parties voluntarily consent.

You may consent to have your case referred to a Magistrate Judge, or you may withhold your consent without adverse substantive consequences.  The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case.

*Consent to a Magistrate Judge's authority.*  The following parties consent to have a United States Magistrate Judge conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings.

| *Parties' printed names* | *Signatures of parties or attorneys* | *Dates* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

### Reference Order

**IT IS ORDERED:**  This case is referred to a United States Magistrate Judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Date:  _____

_____
*District Judge's signature*

_____
*Printed name and title*

Note:  Return this form to the Clerk of the Court **ONLY IF** all parties have consented **ON THIS FORM** to the exercise of jurisdiction by a United States Magistrate Judge.  Return the first page of this form by e-filing a PDF version under "Notices".

**LR 73.1 Special Designation to Exercise Civil Consent Authority**

(a) Authority of a Magistrate Judge. Upon consent of all of the parties, and upon approval of the district judge to whom the case is assigned through entry of an order of reference, a magistrate judge may conduct all proceedings in a civil case and order entry of judgment in the case.

(b) Notice of Consent Option. Upon the filing of a complaint or notice of removal in a civil case, the clerk will give the plaintiff or plaintiff's counsel or the removing defendant or removing defendant's counsel a notice/consent form (form) informing the parties that they may consent to have a magistrate judge conduct all proceedings in the case and order the entry of final judgment. The parties or their attorneys must sign the form if they consent to the exercise of dispositive authority by the magistrate judge. Plaintiff or plaintiff's counsel must attach a copy of the form to each copy of the complaint and summons served. A removing defendant or removing defendant's counsel must include the form with the notice of removal required under 28 U.S.C. §1446(a). Additional copies of the form may be furnished to the parties at later stages of the proceedings. The parties are free to withhold consent without adverse consequences, and any notice or other communication from the court under authority of this LR will so advise them. This section will not apply if the district judge so instructs the clerk.

(c) Execution of Consent. If all of the parties in a civil case consent to have the magistrate judge exercise the authority described in (a), the plaintiff or plaintiff's counsel must file with the clerk the form described in (b), signed by all parties or their attorneys. The clerk will not accept the form without all such signatures, and neither the form nor its contents may be made known or available to a district judge or magistrate judge if it lacks any signatures required under this LR. A party's decision regarding consent will not be communicated to a district judge or magistrate judge before a fully-executed form is filed. Consent in a civil case under (a) may be entered until 30 days before scheduled trial of the case unless otherwise ordered by the district judge.

(d) Reference of Civil Consent Case. Upon filing of an executed form as described in (c), the clerk will send it to the district judge. The district judge may then refer the case to the magistrate judge for all further proceedings. A magistrate judge may exercise consent jurisdiction only if the district judge enters an order specifically referring the case.

(e) Party Added After Consent Occurs. A party added to a civil case after reference of the case to a magistrate judge on consent will be given an opportunity to consent to the continued exercise of case-dispositive authority by the magistrate judge. The clerk will give the party a copy of the form described in (b). A party choosing to consent must, within 30 days of appearance, file with the clerk the form signed by the party or attorney. The case will be returned to the district judge for all further proceedings unless a form is properly signed and filed.

Comment: Review of matters referred under LR 73.1 is in the court of appeals. Review of matters referred under LR 72.1 is by the district judge.

September 08, 1998